# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Philip G. Reinhard | Sitting Judge if Other than Assigned Judge | P. Michael Mahoney |
|---|---|---|---|
| **CASE NUMBER** | 04 C 50289 | **DATE** | 4/25/2005 |
| **CASE TITLE** | Davis vs. Barnhart | | |

**DOCKET ENTRY TEXT:**

For the reasons stated on the attached Memorandum Opinion and Order, the ALJ's decision to deny benefits to Plaintiff is sustained. The ALJ is affirmed at all steps of the disability determination process. Defendant's Motion for Summary Judgment is granted. Plaintiff's Motion for Summary Judgment on the administrative record and pleadings is denied.

■ [ For further detail see attached order.]

Notices mailed by judge's staff.

| | Courtroom Deputy Initials: | AM |
|---|---|---|

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## WESTERN DIVISION

| | | |
|---|---|---|
| MICHELLE L. DAVIS, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 04 C 50289 |
| | ) | |
| v. | ) | Magistrate Judge |
| | ) | P. Michael Mahoney |
| JOANNE B. BARNHART, | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Michelle Davis ("Plaintiff") seeks judicial review of the final decision of the Commissioner of the Social Security Administration ("Commissioner"). *See* 42 U.S.C. §§ 405(g), 1383(c)(3). The Commissioner's final decision denied Plaintiff's application for Disability Insurance Benefits ("DIB") pursuant to Title II of the Social Security Act, 42 U.S.C. § 416, 423. This matter is before the Magistrate Judge pursuant to consents filed by both parties on September 23, 2004. *See* 28 U.S.C. § 636(c); Fed. R. Civ. P. 73.

## I. BACKGROUND

Plaintiff filed for DIB on April 23, 2002, alleging disability since May 30, 2001. (Tr. 57). Her application for benefits was denied on August 16, 2002. (Tr. 23). Plaintiff filed a request for reconsideration on September 20, 2002 (Tr. 29), and the Social Security Administration affirmed its decision on October 21, 2002. (Tr. 29). Plaintiff's request for a hearing before an Administrative Law Judge ("ALJ") was received on November 22, 2002. (Tr. 36). On May 15, 2003, Plaintiff was granted a hearing before ALJ Cynthia M. Bretthauer. (Tr. 51). Plaintiff appeared, with counsel, before the ALJ on June 5, 2003. (Tr. 173). In a decision

dated October 30, 2003, the ALJ found that Plaintiff was not entitled to DIB. (Tr. 14-18). The Appeals Council denied Plaintiff's request for review on April 30, 2004, making this case ripe for review. (Tr. 5).

## II.  FACTS

Plaintiff was born on April 28, 1969, making her approximately thirty-four years of age at the time of her June 5, 2003, hearing before the ALJ. (Tr. 55). Plaintiff completed a high school education. (Tr. 179). At the time of her hearing, Plaintiff lived in an apartment with her husband and her eleven year old daughter. (Tr. 178). Plaintiff claims disability since May 30, 2001, due to multiple sclerosis ("MS"), optic neuritis, major fatigue, muscle tiredness, twitching, heavy limbs, and headaches/migraines. (Tr. 64).

Plaintiff had no reported income after May 30, 2000. (Tr. 64). Plaintiff worked as a secretary from August, 1997, to May, 2000. (Tr. 65). She worked part-time, doing data entry and customer service in an advertising firm. (Tr. 88). Her position required standing and walking for fifteen minutes each a day, sitting three hours a day, crouching ten minutes a day, and writing/typing for four hours a day. (*Id.*). Plaintiff occasionally lifted fifty pounds or more, and frequently lifted objects less than ten pounds. (*Id.*). Plaintiff was paid eight dollars an hour for her services. (*Id.*). Plaintiff also worked as a secretary from January, 1995, to February, 1996 (part-time), and from November, 1987, to August, 1991 (part-time and full-time). (Tr. 65).

Plaintiff worked as a waitress from August, 1996, to June, 1997. (Tr. 87). She worked full-time and part-time at a rate of three dollars per hour, plus tips. (Tr. 89). This position required standing and walking four to eight hours a day and handling large objects for four to eight hours a day. (*Id.*). Plaintiff lifted twenty pounds, and frequently lifted items less than ten

2

pounds. (*Id.*).

Plaintiff worked as a telephone researcher for a marketing firm from July, 1985, to November, 1987. (Tr. 87). At this job, Plaintiff sat at a computer four to eight hours a day, interviewing persons on the phone and entering data. (Tr. 92). Plaintiff was paid six dollars per hour for her services. (*Id.*).

Prior to September 30, 2001, the date Plaintiff's insured status expired, Plaintiff described her symptoms as "PMS-type" symptoms, including tiredness and emotional problems. (Tr. 182, 183). However, in May, 2001, she began to have "really bad eye pain and headaches." (Tr. 183). Plaintiff was initially diagnosed with MS in June, 2001. (Tr. 112).

Plaintiff described her typical day since May, 2001, at her hearing. (Tr. 186). She testified that she had both good and bad days and stated she usually had four to five good days a week. (Tr. 194). On bad days, Plaintiff stated she stayed in bed or in a recliner. (Tr. 195). On good days, Plaintiff stated she did dishes, cooked, did laundry, and could bathe and dress herself. (Tr. 186). Plaintiff also stated she sometimes traveled out of town to visit relatives. (Tr. 187). Occasionally, Plaintiff went out to eat or to the movies. (Tr. 188). Plaintiff stated she read as a hobby, probably a book a week. (*Id.*). Due to her impairments, Plaintiff said she had to give up participating in activities like girl scouts with her daughter and supervising class field trips. (*Id.*). Plaintiff used the computer at home, but reportedly only for an hour a day after June, 2001, due to her eye condition. (Tr. 192). Plaintiff stated she drove two to three days a week to run short errands. (Tr. 178-79).

When questioned by the ALJ, Plaintiff testified that she could walk three to four blocks before she got tired. (Tr. 185). Plaintiff thought she could stand five minutes at a time and sit twenty to thirty minutes at a time before her legs would tingle and go numb. (*Id.*). Plaintiff

thought she could lift ten to twenty pounds. (Tr. 186).

Plaintiff testified about her fatigue at her hearing, stating that she got tired after doing anything physical. (Tr. 180). Humidity was also noted as a factor that "zaps" Plaintiff's strength. (*Id.*). Additionally, Plaintiff indicated that she did not take Provigil, a medication commonly prescribed for fatigue, because she believed the medication would interfere with her birth control pills. (*Id.*). Plaintiff stated she used birth control pills because she did not want to risk having another child and because she needed the hormones for other medical problems. (Tr. 181). Plaintiff also testified that she did not take Amitriptylene or Copaxone, typically prescribed to treat MS, because the drugs did not stop her fatigue and had side effects like itching and bruising. (*Id.*). At the time of Plaintiff's hearing, she took one prescription medication, Zovia (contraceptive pill), and two over-the-counter medications, Benadryl (for itching) and Advil (for pain). (Tr. 106).

The ALJ also questioned Plaintiff about her optic neuritis at her hearing. (Tr. 183). Plaintiff stated that she could not see clearly out of her left eye, and she had headaches and pain whenever she moved her eye side to side. (*Id.*). Plaintiff testified that stress and heat causes her eye to swell and get gummy and blurry. (Tr. 184). Otherwise, Plaintiff stated her vision was good unless she read or used the computer too much. (*Id.*). Sometimes, Plaintiff reported having double vision. (*Id.*).

Plaintiff's headaches were also discussed at Plaintiff's hearing. (Tr. 184). Plaintiff reported that, on average, she had headaches two to three times a week after her initial bout with optic neuritis. (*Id.*). Plaintiff's headaches never necessitated a trip to the emergency room, and usually lasted a couple of hours, but sometimes lasted for up to a week. (Tr. 184, 190). Advil or

Excedrin Migraine was taken by Plaintiff for her headaches. (Tr. 185).

Vocational Expert ("VE"), Ms. Susan Entenberg, testifying before the ALJ, stated that Plaintiff's past work as a secretary was exertionally sedentary, semi-skilled work, and Plaintiff's past work as a waitress was classified as light, unskilled work. (Tr. 197). The ALJ then asked the VE whether a hypothetical person, with the following characteristics, could perform Plaintiff's past work:

> 34 years old, has the work experience and education of the claimant . . . Could sit for six to eight hours, stand and walk at least six hours out of the day. Could lift and carry frequently up to 25 pounds, occasionally up to 50 pounds, with no other restrictions and limitations.

(Tr. 197).

The VE testified that such a hypothetical person could perform Plaintiff's past work (*Id.*). The ALJ then added a requirement to her hypothetical whereby the worker had to avoid concentrated exposure to extreme heat, humidity, or bright lights. (*Id.*). The VE indicated that such a requirement would not affect Plaintiff's past work. (*Id.*). When the ALJ added the limitation that the worker be restricted to light work and lifting and carrying frequently ten pounds, occasionally up to twenty, the VE noted that such a person could still perform Plaintiff's past work. (Tr. 198). After the ALJ's final hypothetical restriction, that the worker needed to nap frequently throughout the day, the VE eliminated Plaintiff's past work. (*Id.*).

## III. MEDICAL HISTORY

Plaintiff was examined by Dr. Jamil Hussain on February 5, 2001, due to an alleged hiatal hernia (where a portion of the stomach protrudes upward into the chest through an opening in the diaphragm) and itchy skin. (Tr. 114). Dr. Hussain reported that Plaintiff's examination

was unremarkable, and that no bruits or masses were present. (*Id.*). Dr. Hussain prescribed Prevacid. (*Id.*). Plaintiff was given Triamcinolone cream to use over her dry skin. (*Id.*).

On June 14, 2001, Dr. Mohammed Hussain examined Plaintiff, who complained of blurry vision and dizziness. (Tr. 111). An MRI showed findings consistent with MS with multiple focal areas of increased intensity in the periventricular white matter. (Tr. 112). A suggestion of left optic neuritis was also noted. (*Id.*).

Dr. Terry Roth saw Plaintiff on July 31, 2001, for further evaluation of her visual symptoms. (Tr. 122). Dr. Roth noted that Plaintiff complained of blurry vision and pain with eye movement as early as June, 2001. (*Id.*). Plaintiff stated she initially saw Dr. Yavitz, who diagnosed dry eye and prescribed some type of drops. (*Id.*). Plaintiff reported problems with fatigue, emotional lability, and being short tempered. (*Id.*). Plaintiff stated Dr. Hussain was going to start her on Wellbutrin to quit smoking and "mellow" her out. (*Id.*). Dr. Roth noted Plaintiff had an irregular left pupil. (*Id.*). He opined that Plaintiff did have a bout of optic neuritis and thought Plaintiff would develop other features of MS. (Tr. 123). Dr. Roth recommended Copaxone[1] as a preventative. (*Id.*).

On August 22, 2001, Plaintiff was seen by clinical neurophysiologist, Dr. Siegel, who tested Plaintiff's visual evoked responses. (Tr. 113). Plaintiff's test results were abnormal with prolongation of the P100 latency in her left eye, which correlated with optic neuritis. (*Id.*).

---

[1]Injections indicated for the reduction of relapses in relapsing-remitting multiple sclerosis. The most common side effects are redness, pain, swelling, itching, or a lump at the injection site. PHYSICIAN'S DESK REFERENCE (59th Ed. 3222).

Plaintiff was seen for a follow up visit with Dr. Roth on September 4, 2001. (Tr. 124). She reported problems with heat and bright lights. (*Id.*). Plaintiff agreed to begin treatment with Copaxone. (*Id.*).

Insured status for Plaintiff expired on September 30, 2001. (Tr. 17).

On October 19, 2001, Dr. Roth reported that Plaintiff was doing well on Copaxone. (Tr. 125). Plaintiff reported an abnormal vibration sensation in her left lower extremity since September 20, 2001, and Dr. Roth opined that it probably represented further features of MS. (*Id.*). Plaintiff reported significant fatigue. (*Id.*). Dr. Roth noted Plaintiff had good motor function and reflexes and hoped Plaintiff's symptoms would calm down over the next couple of months. (*Id.*).

Dr. Roth followed-up with Plaintiff on December 7, 2001. (Tr. 126). Plaintiff still had blurring of vision in her left eye and a vibration sense in her lower extremities, which was aggravated by flexing the neck. (*Id.*). Plaintiff's chief complaint was overwhelming fatigue and problems with memory and concentration. (*Id.*). Neurologically, Plaintiff was stable. (*Id.*). Dr. Roth suggested using Provigil to combat Plaintiff's fatigue. (*Id.*).

Plaintiff began counseling with Dr. Maureen Elick on May 3, 2002. (Tr. 136). Plaintiff stated she was having mood swings, crying for no reason, and being tired all the time, which made it hard to organize her thoughts. (*Id.*). Plaintiff wished the buzzing in her legs would go away, and she also noted muscle twitches and cramping. (*Id.*). Plaintiff stated she had too many "bad days" to look for a job. (*Id.*). Plaintiff had four other therapy sessions with Dr. Elick – one on May 20, 2002, one on June 6, 2002, and two joint sessions with her husband on April 8, 2003, and April 15, 2003. (Tr. 136).

Ophthalmologist Edward Yavitz completed a voluntary state agency ophthalmological report for Plaintiff on June 11, 2002. (Tr. 120). Dr. Yavitz noted that Plaintiff had optic neuritis secondary to MS; no ocular damage. (*Id.*). Plaintiff's vision with glasses was 20/20. (*Id.*). Dr. Yavitz reported a normal prognosis for Plaintiff's left and right eye. (*Id.*).

On July 23, 2002, Plaintiff saw Dr. Roth and described major problems with fatigue and forgetfulness. (Tr. 127). Plaintiff stated she needed to rest for several days after being active, and she described difficulty with decision making. (*Id.*). Plaintiff stated she was seeing a therapist for depression. (*Id.*). Plaintiff had good compliance with Copaxone, but she did not take Provigil for fatigue because she worried about side effects on her birth control pills. (*Id.*). Plaintiff stated she had muscle spasms and twitching, but Dr. Roth opined that her Lhermitte's type symptoms (electric-like shocks extending down the spine triggered by flexing the head) were actually improved. (*Id.*). Plaintiff was able to ambulate without difficulty. (*Id.*). Plaintiff gave Dr. Roth a Family and Medical Leave Act form to complete for her husband because Plaintiff reported that her husband would have to take over some activities with the couple's daughter. (*Id.*). Dr. Roth's continued impression was MS, and he recommended continued treatment with Copaxone to reduce changes and exacerbations. (*Id.*).

Dr. Andrews, a non-examining state agency physician, completed a Residual Functional Capacity Assessment ("RFC") on August 6, 2002. (Tr. 128). Dr. Andrews reported that Plaintiff could occasionally lift/carry/pull fifty pounds, frequently lift/carry/pull twenty-five pounds, and stand/walk/sit for a total of six hours each in an eight hour day with normal breaks. (Tr. 129). No postural, manipulative, visual, environmental, or communicative limitations were noted by Dr. Andrews. (Tr. 129-32). Dr. Andrews opined that Plaintiff was partially credible in

8

that evidence in the file indicated Plaintiff did have MS, but not to a disabling severity. (Tr. 133). Dr. Andrews believed Plaintiff's fatigue limited her activity to medium work. (*Id.*). Dr. Arjmand agreed with Dr. Andrew's findings on October 15, 2002. (Tr. 128).

## IV.   **STANDARD OF REVIEW**

The court may affirm, modify, or reverse the ALJ's decision outright, or remand the proceeding for rehearing or hearing of additional evidence. 42 U.S.C. § 405(g). Review by the court, however, is not *de novo*; the court "may not decide the facts anew, reweigh the evidence or substitute its own judgment for that of the [ALJ]." *Binion v. Charter,* 108 F.3d 780, 782 (7th Cir. 1997); *see also Maggard v. Apfel*, 167 F.3d 376, 379 (7th Cir. 1999). The duties to weigh the evidence, resolve material conflicts, make independent findings of fact, and decide the case accordingly are entrusted to the commissioner; "[w]here conflicting evidence allows reasonable minds to differ as to whether a claimant is entitled to benefits, the responsibility for that decision falls on the Commissioner." *Schoenfeld v. Apfel*, 237 F.3d 788, 793 (7th Cir. 2001). If the Commissioner's decision is supported by substantial evidence, it is conclusive and this court must affirm. 42 U.S.C. § 405(g); *see also Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). "Substantial evidence" is "evidence which a reasonable mind would accept as adequate to support a conclusion." *Binion*, 108 F.3d at 782.

The Seventh Circuit demands even greater deference to the ALJ's evidentiary determinations. So long as the ALJ "minimally articulate[s] her reasons for crediting or rejecting evidence of disability," the determination must stand on review. *Scivally v. Sullivan*, 966 F.2d 1070, 1076 (7th Cir. 1992). Minimal articulation means that an ALJ must provide an opinion that enables a reviewing court to trace the path of her reasoning. *Clifford v. Apfel*, 227 F.3d 863, 874 (7th Cir. 2000); *Rohan v. Charter*, 98 F.3d 966, 971 (7th Cir. 1996). Where a

witness credibility determination is based upon the ALJ's subjective observation of the witness, the determination may only be disturbed if it is "patently wrong" or if it finds no support in the record. *Pope v. Shalata*, 988 F.2d 473, 487 (7th Cir. 1993); *Stuckey v. Sullivan*, 881 F.2d 506, 509 (7th Cir. 1989). "However, when such determinations rest on objective factors of fundamental implausibilities rather than subjective considerations, [reviewing] courts have greater freedom to review the ALJ decision." *Herron v. Shalala*, 19 F.3d 329, 335 (7th Cir. 1994); *Yousif v. Chater*, 901 F. Supp. 1377, 1384 (N.D. Ill. 1995).

## V.   FRAMEWORK FOR DECISION

The ALJ concluded that Plaintiff did not meet the Act's definition of "disabled," and accordingly denied her application for benefits. "Disabled" is defined as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382(c)(3)(A). A physical or mental impairment is one "that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 1382(c)(3)(C); *see also Clark v. Sullivan*, 891 F.2d 175, 177 (7th Cir. 1988).

The Commissioner proceeds through as many as five steps in determining whether a claimant is disabled. 20 C.F.R. §§ 404.1520(a)-(f), 416.920(a)-(f) (1998).[2] The Commissioner sequentially determines the following: (1) whether the claimant is currently engaged in

---

[2]The Commissioner has promulgated parallel regulations governing disability determinations under Title II and Title XVI. *See* 20 C.F.R. Ch. III, Pts. 404, 416. For syntactic simplicity, future references to Pt. 416 of the regulations will be omitted where they are identical to Pt. 404.

substantial gainful activity; (2) whether the claimant suffers from a severe impairment; (3) whether the impairment meets or is medically equivalent to an impairment in the Commissioner's Listing of Impairments; (4) whether the claimant is capable of performing work which the claimant performed in the past; and (5) whether the claimant is capable of performing any other work in the national economy.

At Step One, the Commissioner determines whether the claimant is currently engaged in substantial gainful activity. 20 C.F.R. § 404.1520 (a)(b). Substantial gainful activity is work that involves doing significant and productive physical or mental duties that are done, or intended to be done, for pay or profit. 20 C.F.R. § 404.1510. If the claimant is engaged in substantial gainful activity, he or she is found not disabled, regardless of medical condition, age, education, or work experience, and the inquiry ends; if not, the inquiry proceeds to Step Two.

Step Two requires a determination whether the claimant is suffering from a severe impairment.[3] A severe impairment is one which significantly limits the claimant's physical or mental ability to do basic work activities. 20 C.F.R. § 404.1520(c). The claimant's age, education, and work experience are not considered in making a Step Two severity determination. 20 C.F.R. § 404.1520(c). If the claimant suffers from severe impairment, then the inquiry moves on to Step Three; if not, then the claimant is found to be not disabled, and the inquiry ends.

At Step Three, the claimant's impairment is compared to those listed in 20 C.F.R. Ch. III, Part 404, Subpart P, Appendix 1. The listings describe, for each of the major body systems, impairments which are considered severe enough *per se* to prevent a person from doing any

---

[3]The claimant need not specify a single disabling impairment, as the Commissioner will consider the combined affect of multiple impairments. *See, e.g.*, 20 C.F.R. § 404.1520(c). For syntactic simplicity, however, this generic discussion of the Commissioner's decision-making process will use the singular "impairment" to include both singular and multiple impairments.

11

significant gainful activity. 20 C.F.R. §§ 404.1525(a). The listings streamline the decision process by identifying certain disabled claimants without need to continue the inquiry. *Bowen v. New York*, 476 U.S. 467 (1986). Accordingly, if the claimant's impairment meets or is medically equivalent to one in the listings, then the claimant is found to be disabled, and the inquiry ends; if not, the inquiry moves on to Step Four.

At Step Four, the Commissioner determines whether the claimant's residual functional capacity allows the claimant to return to past relevant work. Residual functional capacity is a measure of the abilities which the claimant retains despite her or her impairment. 20 C.F.R. § 404.1545(a). Although medical opinions bear strongly upon the determination of residual functional capacity, they are not conclusive; the determination is left to the Commissioner, who must resolve any discrepancies in the evidence and base a decision upon the record as a whole. 20 C.F.R. § 404.1527(e)(2); *Diaz v. Chater*, 55 F.3d 300, 306 n.2 (7th Cir. 1995). Past relevant work is work previously performed by the claimant that constituted substantial gainful activity and satisfied certain durational and recency requirements. 20 C.F.R. § 404.1465; Social Security Ruling 82-62. If the claimant's residual functional capacity allows him to return to past relevant work, then he is found not disabled; if he is not so able, the inquiry proceeds to Step Five.

At Step Five, the Commissioner must establish that the claimant's residual functional capacity allows the claimant to engage in work found in significant numbers in the national economy. 20 C.F.R. §§ 404.1520(f), 404.1566. The Commissioner may carry this burden by relying upon vocational expert testimony, or by showing that a claimant's residual functional capacity, age, education, and work experience coincide exactly with a rule in the Medical-Vocational Guidelines (the "grids"). *See* 20 C.F.R. Ch. III, Part 404 Subpart P, Appendix 2;

*Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir. 1987); Social Security Law and Practice, Volume 3, § 43:1. If the ALJ correctly relies on the grids, vocational expert evidence is unnecessary. *Luna v. Shalala*, 22 F.3d 687, 691-92 (7th Cir. 1994). If the Commissioner establishes that sufficient work exists in the national economy that the claimant is qualified and able to perform, then the claimant will be found not disabled; if not, the claimant will be found to be disabled.

## VI. ANALYSIS

The court will proceed through the five step analysis in order.

### A. Step One: Is the claimant currently engaged in substantial gainful activity?

In performing the Step One analysis, the ALJ found no evidence of Plaintiff working after the alleged onset date in her case. (Tr. 15). The finding of the ALJ as to Step One of the analysis is not challenged by either party, and the court finds no reason to disturb this finding. The ALJ's determination that Plaintiff satisfies Step One of the analysis is affirmed.

### B. Step Two: Does the claimant suffer from a severe impairment?

In performing the Step Two analysis, the ALJ found Plaintiff suffered from severe impairments. (Tr. 15). This finding is not challenged by either party, and the court finds no reason to disturb it. Substantial evidence exists to support the ALJ's determination that Plaintiff suffers from severe impairments. The ALJ's finding as to Step Two of the analysis is affirmed.

### C. Step Three: Does claimant's impairment meet or medically equal an impairment in the Commissioner's listing of impairments?

In performing the analysis for Step Three, the ALJ determined that Plaintiff's impairments do not meet or equal any impairment in the Listing of Impairments, C.F.R. § 404.1520(d); 20 C.F.R. Pt. 404, Subpt. P, App. 1. (Tr. 15, 17). In particular, the ALJ found that

Plaintiff did not meet the requirements of Listing 11.09, multiple sclerosis. (Tr. 15). In support of this finding, the ALJ stated that Plaintiff "did not have the disorganization of motor function, visual or mental deficits, or significant, reproducible fatigue or motor function with substantial muscle weakness on repetitive activity, needed to meet the requirements of listing 11.09." (*Id.*).

Neither party challenges the ALJ's finding under Step Three. As substantial evidence exists to support the ALJ's Step Three finding, this court finds no reason to disturb it. Therefore, the ALJ's determination as to Step Three of the analysis is affirmed.

**D.     Step Four:  Is the claimant capable of performing work which the claimant performed in the past?**

In performing the analysis for Step Four, the ALJ determined that Plaintiff is able to perform her past relevant work because she retained the physical capacity to perform her past jobs as a secretary and waitress based on the VE's testimony that such jobs were either sedentary/light and unskilled/semi-skilled jobs. (Tr. 17). Before doing so, the ALJ determined Plaintiff's residual functional capacity ("RFC"). The RFC is what the claimant can still do despite his or her physical limitations. *See* 20 C.F.R. §416.945. After considering the entire record, the ALJ found Plaintiff's RFC to preclude the following work related activities prior to September 30, 2001:

> lifting more than 50 pounds occasionally or more than 25 pounds
> frequently; concentrated exposure to bright lights; and performing
> jobs in relative extremes of heat and humidity.

(Tr. 15).

The ALJ reported that the objective findings in Plaintiff's medical history failed to provide support for her allegations of disabling symptoms and limitations greater than those

14

listed above (prior to her date last insured). (*Id.*). In support of this statement, the ALJ noted that: (1) Plaintiff had no ocular damage by June 11, 2002, and her eye prognosis was normal; (2) Plaintiff's multiple sclerosis had not yet exacerbated or increased to a point where additional limitations would be warranted; (3) the medical record did not support Plaintiff's complaints of depression as her condition did not cause any significant difficulties; (4) the record indicated the Plaintiff was able to perform daily activities like reading a book and working on the computer prior to September, 2001; (5) Plaintiff stopped working because of "office politics" and not due to physical limitations; ans (6) Plaintiff was not compliant in taking her prescribed medications. (Tr. 16-17).

The findings of the ALJ at Step Four of the Analysis are challenged by Plaintiff. Foremost, Plaintiff argues that the ALJ made an improper credibility assessment that led to an unreasonable RFC determination. Plaintiff also argues that the ALJ should have informed her decision with expert testimony. Finally, Plaintiff argues the ALJ did not properly evaluate her mental condition under 20 C.F.R. § 404.1520a(b)(1). Defendant rebuts each of Plaintiff's arguments. First, Defendant maintains that the ALJ's credibility determination and RFC were supported by the record. Second, Defendant states that the ALJ had ample evidence on which to base her opinion. Finally, Defendant asserts that 20 C.F.R. § 404.1520a(b)(1) was not triggered because the ALJ did not determine that Plaintiff had a medically determinable mental impairment. Each issue will be addressed in turn.

### A.    The ALJ's Credibility Assessment

Generally, a court will only reverse an ALJ's credibility determination if it is "patently wrong." *Jens v. Barnhart*, 347 F.3d 209, 213 (7th Cir. 2003). However, when a credibility

finding "rests on objective factors or fundamental implausibilities rather than subjective considerations, appellate courts have greater freedom to review the ALJ's decision." *Herron v. Shalala*, 19 F.3d 329, 335 (7th Cir. 1994). In evaluating credibility, the ALJ must also follow her own regulations, including SSR 96-7p, which lists relevant considerations for evaluating credibility. *Lopez v. Barnhart*, 336 F.3d 535, 539-40 (7th Cir. 2003). "The reasons for the credibility finding must be grounded in the evidence and articulated in the determination or decision." *See* SSR 96-7p. Thus, an ALJ's conclusion is afforded great deference so long as the court finds that the ALJ followed proper procedures in making his or her determination. Even so, administrative law opinions are subject to harmless error review, such that every technical violation of the SSR does not equate to an automatic reversal or remand. *See Keys v. Barnhart*, 347 F.3d 990 (7th Cir. 2003).

In this case, the court finds that the ALJ's credibility determination was grounded in the record and adequately justified in her opinion. The ALJ did not randomly discredit Plaintiff's complaints of disabling symptoms. Rather, the ALJ specifically stated that she did not find Plaintiff's subjective complaints entirely credible, and she discussed the reasons for her disbelief, detailing the lack of objective evidence supporting Plaintiff's complaints. The ALJ then determined Plaintiff's RFC, in light of her credibility finding, and this court also finds the RFC to be backed by substantial evidence in the record.

Beginning with Plaintiff's MS, the ALJ noted that Plaintiff's medical records did not correspond with the severity of Plaintiff's alleged symptoms. (Tr. 15-17). In particular, Plaintiff's June, 2001, bout with optic neuritis did not cause ocular damage, and her prognosis for

her eyes was normal by June, 2002. (Tr. 16). Plaintiff's eye pain resolved itself in a couple of weeks. (Tr. 122). Many of Plaintiff's neurological symptoms were improving by December, 2001, according to Dr. Roth's report. (Tr. 17, 126). Moreover, the ALJ noted that though Dr. Roth initiated medication of Plaintiff's MS on September 4, 2001, Dr. Roth did so to stem *future* exacerbations, not to treat Plaintiff's *current* symptoms, which had not yet increased to a point where physical limitations would be warranted. (*Id.*). Additionally, the ALJ noted that Plaintiff's failure to take or even try prescription medications suggested that Plaintiff's symptoms may not have been as limiting as the Plaintiff alleged. (Tr. 17). Though the ALJ recognized that Plaintiff did not want to medicate her fatigue due to a potential interference with her birth control medication, the ALJ noted that Plaintiff stopped taking her MS medication because she "did not notice any difference," even though Copaxone is prescribed to alleviate future exacerbations, not current symptoms.

The ALJ also noted that Plaintiff had no reported difficulties caused by her fatigue prior to September 30, 2001. (*Id.*). However, on July 31, 2001, Plaintiff did describe problems with fatigue to Dr. Roth. (Tr. 122). Plaintiff did not describe any focal neurologic symptoms at the time, and the record was not at all specific as to any physical or mental limitations caused by Plaintiff's fatigue. (*Id.*). Plaintiff also did not report fatigue to Dr. Roth on September 4, 2001. (Tr. 124). In fact, significant reports of fatigue and problems with concentration were not recorded until December 7, 2001, when Dr. Roth suggested Plaintiff take Provigil, which Plaintiff did not take, as discussed above. (Tr. 126). Thus, before Plaintiff's date last insured, it does not appear that Plaintiff's fatigue was a significant limiting factor.

17

Regarding Plaintiff's complaints of depression, the ALJ found the medial record did not show any significant difficulties prior to September 30, 2001. (Tr. 16). This court agrees. Plaintiff did not begin counseling with Dr. Maureen Elick until May 3, 2002, and even then Plaintiff attended a total of five therapy sessions (some of which were joint marital sessions), and she was not prescribed any medications. (Tr. 136). Plaintiff's therapy centered on improving communication and identifying needs and support possibilities. (*Id.*). Dr. Terry Roth saw Plaintiff on July 31, 2001, when Plaintiff first began experiencing problems with fatigue, emotional lability, and being short tempered. (Tr. 122). Though anti-depressant medication was discussed then (Plaintiff stated Dr. Hussain was going to start her on Wellbutrin to quit smoking and "mellow" her out), it does not appear that Plaintiff ever began taking Wellbutrin. (*Id.*).

As another factor in weighing Plaintiff's credibility regarding Plaintiff's allegations of disabling symptoms, the ALJ considered Plaintiff's daily living activities as required by Social Security Regulation 96-7p ("SSR 96-7p"). Prior to September, 2001, the ALJ noted that Plaintiff was able to read one book a week and work on the computer. Admittedly, Plaintiff's admissions of reading and working on the computer for an hour a day are not inconsistent with her claims of disabling symptoms, given the remissions and exacerbations common to MS, and the court does not agree with the ALJ on this point. However, Plaintiff's daily living activities were not the only basis for the ALJ's decision to partially discredit Plaintiff's alleged symptoms.

In addition to the evidence noted by the ALJ that casts doubt on the severity of each of Plaintiff's alleged impairments, the court notes that not one of Plaintiff's physicians indicated that Plaintiff is disabled or imposed any restrictions on Plaintiff's physical activities. In fact, the state agency physicians did find Plaintiff capable of medium work. (Tr. 128). Finally, the court

agrees with the ALJ that while Plaintiff objectively established that she had MS, medical evidence confirming the severity of her fatigue or establishing that her MS reached a stage where it was reasonably likely to produce a level of fatigue that could fairly be regarded as disabling was lacking. Plaintiff retained the burden to establish her RFC. *See Bowen v. Yuckert*, 482 U.S. 137, 146 (1987). Yet, Plaintiff did not offer evidence of mental or physical limitations beyond her own subjective complaints, which the ALJ reasonably found exaggerated based on Plaintiff's medical records.

Given the ALJ's supported decision for finding Plaintiff's complaints not entirely credible and Plaintiff's longitudinal medical record, this court finds the ALJ's credibility determination and RFC to be reasonable and sufficiently explained. As such, the court finds no reason to reverse the ALJ's findings, nor to remand for a new RFC or credibility determination.

### B. Expert Testimony

Plaintiff contends that the ALJ should have obtained medical expert testimony to inform her decision because of the complexity of optic neuritis and MS. Plaintiff also argues that the ALJ should have asked Dr. Roth for his opinion on Plaintiff's functional limitations. (Pl.'s Mem., at 13-14). Defendant maintains that Plaintiff's record was sufficient to determine whether Plaintiff was disabled. (Def.'s Mem., at 12).

It is the ALJ's duty to obtain additional evidence if the evidence before her is insufficient to determine whether a claimant is disabled or, if after weighing the conflicting evidence, she cannot reach a conclusion. 20 C.F.R. § 404.1527(c)(3). Medical reports from a treating physician are generally sufficient to document that physician's findings, without actual testimony from the physician. HALLEX I-2-518. When the evidence received from a treating

19

physician or other medical source is inadequate for an ALJ to determine whether a claimant is disabled, the ALJ should request additional information to reach a determination or a decision. 20 C.F.R. § 404.1520(e).

In this case, the significance of Plaintiff's clinical findings regarding her MS and optic neuritis in the record are clear (Tr. 112-13), and the ALJ reasonably concluded no medical expert was needed to assist her in assessing their significance. Drs. Pierce and Siegel adequately summarized their impressions of Plaintiff's MRI and vision screening, so there was no need for the ALJ to interpret the meaning of objective medical evidence "beyond the ken" of the ALJ as Plaintiff suggests. As the court reads the record, the doctors' findings were not particularly confusing, nor did they conflict with other medical evidence in the record.

Likewise, Dr. Roth's records are clear and appear complete. (Tr. 122-27). From July 2001, to July, 2002, Dr. Roth never discussed any physical or mental limitations that would restrict Plaintiff's activities. At each visit, he noted that Plaintiff could ambulate without difficulty, and he noted that Plaintiff's reflexes were normal and symmetric. (Tr. 125, 127). Dr. Roth characterized Plaintiff's MS symptoms as a "minor exacerbation" on October 19, 2001. (Tr. 125). More than two months beyond Plaintiff's date last insured, Dr. Roth stated Plaintiff was neurologically stable, and noted her vibration symptoms were improved. (Tr. 126). Given Plaintiff's last insured date and Plaintiff's failure to point to additional relevant evidence that greater limitations should have been included in her RFC, this court finds no reason to reverse the ALJ's decision or to remand for further expert testimony.

C.      20 C.F.R. § 404.1520a

Plaintiff contends the ALJ failed to properly evaluate her mental condition with the special technique required under 20 C.F.R. § 404.1520a. According to the regulation, the ALJ must first evaluate a claimant's "pertinent symptoms, signs, and laboratory findings" to determine whether a medically determinable mental impairment exists. 20 C.F.R. § 404.1520a(b)(1). Then, if the ALJ determines that a medically determinable mental impairment exists, a written decision issued by the ALJ must incorporate the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of mental impairments. 20 C.F.R. § 404.1520a(b)(2). The decision must also include a specific finding as to the degree of limitation in each of the functional areas: activities of daily living; social functioning; concentration, persistence, or pace, and episodes of decompensation. 20 C.F.R. § 404.1520a(c).

In this case, regarding Plaintiff's complaints of depression, the ALJ stated, "the medical record fails to show that this condition caused her any significant difficulties prior to September 30, 2001. Thus, this alleged impairment is determined to be non severe for that period, and would impose no additional limitations to those assigned in the RFC above." (Tr. 16). The ALJ made no other findings regarding Plaintiff's complaints of depression.

Defendant contends that the ALJ was not required to make the requisite findings as to the degree of limitation in each of the functional areas under 20 C.F.R. § 404.1520a(c) because the ALJ did not find the Plaintiff had a medically determinable mental impairment. Defendant also states that the medical record does not include findings that would establish a mental impairment. This court agrees. Only three pages in Plaintiff's medical reports relate to Plaintiff's alleged mental impairments. (Tr. 122 (on July 31, 2001, Dr. Roth notes Plaintiff may

take Wellbutrin to stop smoking and to "mellow out"), 127 (on July 23, 2002, Dr. Roth notes

Plaintiff is seeing a therapist for probable depression), Tr. 136 (Dr. Elick's one page summary of

her five sessions with Plaintiff, dated June 2, 2003)). Plaintiff was never medicated for

depression. Dr. Elick did not diagnose Plaintiff with depression. After Plaintiff's five sessions

(some of which were marital issue sessions), Dr. Elick did not recommend further sessions. (Tr.

136). Accordingly, this court will not remand for further development of Plaintiff's mental

impairments by the ALJ. As substantial evidence exists to support the ALJ's Step Four finding,

this court finds no reason to disturb it. The ALJ's determination as to Step Four is affirmed.

## VII.    CONCLUSION

For the foregoing reasons, the ALJ's decision to deny benefits to Plaintiff is sustained.

The ALJ is affirmed at all steps of the disability determination process as outlined above.

Defendant's Motion for Summary Judgment is granted. Plaintiff's Motion for Summary

Judgment on the administrative record and pleadings is denied.


ENTER:

**P. MICHAEL MAHONEY, MAGISTRATE JUDGE**
**UNITED STATES DISTRICT COURT**

DATE: 4/25/05